**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**ROBERT A. LOVEDAY,**

      **Plaintiff,**

**vs.**                            **Case No. 1:10cv14-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and the Commissioner ordered to grant Plaintiff's application for benefits.

**Procedural status of the case[1]**

Plaintiff, Robert A. Loveday, applied for supplemental security income benefits.

Plaintiff was 19 years of age on December 11, 2003, the alleged onset date, has a 9th

grade education, and has no past relevant work.  Plaintiff alleges disability due to mild

mental retardation meeting Listing 12.05C, adjustment disorder, degenerative disc

disease of the cervical region of his spine, left shoulder rotator cuff sprain, and

idiopathic[2] gastroparesis.[3]

This case previously was before this court as case number 1:07cv84-MP/AK.

The Commissioner moved for a remand in that case and represented:

> Upon receipt of the Court's remand order, the Appeals Council will remand
> the case to an ALJ with instructions to secure the clamant's complete
> academic record beginning with the kindergarten through the sixth grade
> (Plaintiff had been home schooled thereafter) (Tr. 123).  The ALJ will
> particularly seek the results of any IQ testing and the results of any
> toxicology studies performed by Meridian Behavioral Healthcare.  The ALJ
> will also obtain medical expert evidence to ascertain the nature and

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.   The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[2] Idiopathic is arising spontaneously or from an obscure or unknown cause. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[3] Gastroparesis is a partial paralysis of the stomach and is characterized by a triad of postprandial symptoms: nausea, vomiting, and abdominal distension.  MEDLINE PLUS (MERRIAM-WEBSTER).

Case No. 1:10cv14-MP/WCS

> severity of Plaintiff's impairments, determine possible impact of Plaintiff's drug use, consider the impact of reported dyslexia and learning disability on his IQ scores, *address the issue of the validity of IQ test results*, *and provide a specific rationale regarding whether claimant is disabled at step three of the sequential evaluation under listing § 12.05C.*

Case No. 1:07cv84-MP/AK, doc. 14 (memorandum in support of the motion to remand, emphasis added). This court remanded to address these issues. Docs. 15 and 17 in that case.

On remand, the Administrative Law Judge held two more hearings. She found at step 1 that Plaintiff had performed work at the substantial gainful activity level in 2008 and in the first quarter of 2009. R. 355. Plaintiff earned $19,070.90 in 2008 and $4,180.00 in the first quarter of 2009. *Id.* Thus, the sequential evaluation stopped at the end of the first quarter with a finding of not disabled. Plaintiff does not challenge this finding. The sequential analysis picked up again at the beginning of the second quarter of 2009, and it is Plaintiff's claim for disability benefits for that period forward which is at issue in this case.

At step 3, the ALJ found that Plaintiff did not have an impairment meeting a Listed impairment. At steps 4 and 5, the ALJ found that Plaintiff has no past relevant work (despite the substantial gainful activity), R. 362, but has the residual functional capacity to do light work involving simple, routine, repetitive tasks. R. 359. Relying upon Medical-Vocational Rule 202.17 of the "grids,"[4] a finding of not disabled was entered. R. 362-363.

---

[4] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

The first hearing was held on October 17, 2005.  R. 317.  Plaintiff was married at

the time and had a child.  R. 322-323.  He said that he had been asked to move out due

to a domestic violence charge.  R. 324.  He was in anger management classes.  *Id.*  His

child lived temporarily with Plaintiff's mother, but was in foster care at the time of the

hearing.  R. 324-325.  His wife was living with her mother.  *Id.*  The details of the

domestic violence were unclear.[5]  *Id.*

Plaintiff said he tried to work to pay rent, but could not keep a job.  R. 325.  He

said he tried to work for a pizza business, writing down orders, but made mistakes.  R.

329.  He did tile work for his father, but since this work was with his father, he did not

think it was a "real job."  R. 330.  He said he had trouble using a measuring tape in

construction work.  *Id.*  He said he worked as a dishwasher, made mistakes, and was

terminated.  *Id.* and R. 331.  Plaintiff said he had trouble remembering work instructions.

R. 340.  He said he was easily distracted.  *Id.*

---

[5] It is noted elsewhere in the record that Plaintiff's wife was 15 years of age.  Plaintiff
was not too much older.

Plaintiff said that he has stomach problems and throws up every morning.  R. 332.  He said he has had this condition for about 10 years.  *Id.*  He takes Prilosec[6] and Zoloft.[7]  *Id.*  He said that the medications did not help.  *Id.*  He was still taking a diminished dose of Zoloft.  R. 333.

Plaintiff also testified that he had an injured shoulder from a sawmill accident, and his shoulder "goes in and out of place real easily."  R. 333.  He said he was in a car accident, and injured his neck and right hip.  R. 334.  He cannot use his left arm to wash very well.  *Id.*

Plaintiff said he does not cook for himself.  R. 334.  He testified that he does not know how to do his laundry, and does not do it.  R. 335.  He had a friend who helped with laundry.  *Id.*  He did not shop for groceries.  *Id.*

A vocational expert testified.  R. 342.  He was asked to assume an individual who cannot read or write, with no past relevant work, but who can perform simple, repetitive, routine tasks.  R. 343.  The vocational expert said that such a person could do work as a kitchen worker, including dishwasher, a medium exertional level, unskilled, job with an SVP of 2.[8]  R. 344.  He identified other jobs which such a person could do: warehouse

---

[6] Prilosec is prescribed for the short-term treatment of stomach ulcers, duodenal ulcers, erosive esophagitis (inflammation of the esophagus), heartburn, and other symptoms of gastroesophageal reflux disease (GERD).  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[7] Zoloft is prescribed for major depression.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[8] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* SSR 00-4p, available

worker, medium, unskilled, SVP2; hand packager, medium, SVP2; cleaner, light, SVP2;

dry cleaning workers, light, unskilled, SVP 2; food preparation worker, medium,

unskilled, SVP 2. *Id.* The vocational expert said, however, that if the individual were

unable to follow instructions or stay on task, then there were no jobs that he could do.[9]

R. 347. The same would be true if the individual could not accept supervision or get

along with coworkers. R. 348.

The first hearing after remand by this court was held on December 3, 2008. R.

464. Plaintiff testified that he had a driver's license and drove a motor vehicle. R. 473.

He drove himself to the hearing. *Id.* He said that he failed the driver's test twice, and

had the test read to him. R. 485-486.

He said he was then working at Midwest Feed and Farms, and had worked there

about a year, but someone else had been hired because, said Plaintiff, he could not do

the job correctly. R. 476. The business sold feed for horses and cows. *Id.* Plaintiff

said that he did not handle money or receipts in this job, but was a dock worker. R.

477. Plaintiff said that prior to this, he worked for Northwest Landscaping, cutting grass

and mulching. *Id.* He said he worked in that job for four months, but was fired because

he could not do the work correctly. R. 478. He said he cut the grass too low and then

said he thought that he put the blades on backwards and broke the mower. *Id.* He had

also worked for another lawn service for about three months, broke "a lot of equipment,"

---

at 2000 WL 1898704.

[9] He said: "Then I don't think SGA [substantial gainful activity] would be possible." R.
347.

and was fired.  R. 479.  He further said he could not run the "weed eater" correctly even though he had had a "lot of practice" doing it.  R. 480.

Plaintiff said he lived with his girlfriend for about a year.  R. 481.  He said he no longer felt like "going out" any more.  *Id.*  He and his girlfriend used to go to St. Augustine beach, to the movies, and to eat out.  *Id.*

When asked why he thought he was disabled, Plaintiff said he was depressed and his back hurt "really bad."  R. 482.  He said it was both emotional and physical.  *Id.* He said that when he was ten years old, he "broke" his back.  R. 483.  He said he "tore his shoulder off the bone" picking up logs at another job.  R. 484.  He said that he was "falling apart" and "I'm . . . really hurting right now."  *Id.*

With respect to the feed store job, Plaintiff said he cannot read the invoices correctly, and cannot do the numbers.  R. 486.  He said that he has to ask customers for help identifying bags to be sold.  *Id.*  He had given customers the wrong bags in the past.  R. 487.  When asked about his ability to concentrate, Plaintiff said he could not concentrate well at all, and it "just seems like I can't do anything right."  *Id.*  Plaintiff's attorney then noted that Plaintiff had been crying during this hearing, and Plaintiff said that he breaks down, and falls apart, a lot.  R. 487-488.

The hearing ended prematurely as more time was needed.  R. 488-491.  Further, and the medical expert whom the ALJ had called for telephonic testimony had another appointment and became unavailable.  *Id.*

The second hearing after remand was held on July 22, 2009.  R. 492.  Plaintiff's attorney attended, but Plaintiff did not.  R. 494.  Psychologist, Dr. Carlos Kronberger, an

expert in general psychology, testified.[10]  R. 496.  He reviewed the evidence in the case

but did not examine or test Plaintiff.  *Id*.  Dr. Kronberger said that he had reviewed the

psychology assessments, and did not believe that Plaintiff was mentally retarded.  R.

500.  He said he thought that Plaintiff could do simple, repetitive tasks.  *Id*.  He

reasoned that Plaintiff had worked for his father, laying tiles, had done lawn care work,

and had worked as a cook, and this was evidence to him that Plaintiff can do simple,

repetitive tasks.  *Id*.  He admitted, however, that there was not a lot of information about

Plaintiff's mental ability, and "we don't know why he left those jobs that he had.  We

don't [know] what specific problems he had."  R. 502.

Dr. Kronberger said that he did not think that the IQ testing (by Dr. Benet, to be

discussed ahead) produced "a valid assessment overall," and he would not base his

opinion "on this one test."  R. 508.  He said that Dr. Benet did not enter a diagnosis of

mild mental retardation, and he observed that Dr. Benet reported that the scores were

"probably not valid."  R. 509.  He noted that Dr. Nazario suggested that Plaintiff is mildly

mentally retarded, but he felt that this was error.  *Id*.

Dr. Kronberger said he did not agree that the medical records showed that

Plaintiff had problems with generalized anxiety and depression in addition to a low IQ

score.  R. 509-510.  He explained again that he did not think that the IQ score was valid,

and he thought that Plaintiff seemed to be unreliable with respect to his report of

symptoms.  R. 511.  He also thought that there was no evidence of the training of the

person who entered a diagnosis of generalized anxiety disorder and major depression

---

[10] This witness is referred to as "Dr." in the transcript.  R. 496.  Later, Plaintiff's
attorney refers to him as a psychologist.  R. 499.

disorder or evidence for those diagnoses.  R. 512.  Dr. Kronberger also disagreed with

the assignment of the Global Assessment of Functioning (GAF) score of 45 by the same

person.[11]  R. 513.

Dr. Kronberger agreed with the limitations found by the non-examining state

agency physicians, that Plaintiff had mild limitations in activities of daily living and social

functioning, and moderate limitations in concentration, persistence, and pace.  R. 501-

502.

Dr. Kronberger said that there was some evidence that Plaintiff used marijuana.

R. 501.  He said that if he continued to use marijuana, that "would definitely have an

[e]ffect] on his functioning."  *Id*.

**Medical evidence**

On August 26, 2002, Plaintiff was seen at Meridian Behavioral Healthcare, Inc.

by a registered mental health counselor intern.  R. 263-264, 255.  He was 17 years old

at that time.  R. 263.  He had been referred by "DJJ" (Florida Department of Juvenile

Justice) due to a charge of possession of drug paraphernalia.  *Id*.  There is also a note

that this was ordered by the court.  R. 255.  Plaintiff denied that he was depressed or

---

[11] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at:  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp."  The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

that he experienced mood swings. R. 263. His thought process was organized and his perception and cognitive functions were intact. R. 257. It was determined that services were not appropriate for him at that time, and a GAF score of 70 was assigned. R. 263-264. It was suggested that adjustment disorder, not otherwise specified, be ruled out, and his prognosis was thought to be fair. R. 264.

On September 30, 2002, when he was 17 years old, Plaintiff was evaluated in public school. R. 144. He was unable to read. *Id.* He was receiving special education services for a learning disability. *Id.* It was also noted that Plaintiff was cooperative and worked diligently, but was not a functional reader and was reading at a first grade level. R. 145. He had difficulties with math and did not have "basic foundational skills needed for current classroom curriculum." *Id.* Plaintiff was interested in cars, was enrolled in auto mechanics; he was also interested in arc welding. R. 146.

On February 13, 2004, Plaintiff was seen by an addictions senior clinician at Meridian Behavioral Healthcare, Inc. R. 253-254. It was noted that Plaintiff had occasionally used a number of drugs (opiates, benzodiazepines, LSD, and marijuana) and alcohol. R. 253. He said he had started smoking marijuana at age 11 and now, at age 19, smoked it three times a week. *Id.* He had spent a lot of money on marijuana. *Id.* Plaintiff had a criminal record for his involvement with marijuana. R. 254. His father, older brother, and sister all had serious substance abuse problems. *Id.* Plaintiff said he smoked marijuana to improve his appetite. *Id.* He said that he wanted to stop because he was going to be a father. *Id.*

On February 19, 2004, Andres Nazario, Ph.D., LMFT, conducted a "General Clinical Evaluation with Mental Status." R. 148. Plaintiff was transported to the interview by his mother. *Id.* Plaintiff had a valid Florida driver's license. *Id.* He said he had applied for social security disability benefits because he did not seem to do anything right. *Id.* Plaintiff said he had never shopped for groceries and could not do so. R. 149. He said that he was able to take care of his personal hygiene and could cook a "little bit." *Id.* He said he had a girlfriend whom he sees "pretty much all the time." R. 150. On examination, Plaintiff was found to be oriented in person, place, and time, and his memory, both recent and remote, appeared to be intact. *Id.* He could name the Present of the United States as well as the former President, and could recall "similar" types of information. *Id.* Dr. Nazario further noted:

> He was able to perform a series of mental status tests without error or difficulty. Asked to find a similarity between and apple and an orange he stated "they are both fruits, both round." He was able to subtract seven from 100, and [was] able to count backwards from 20. He was able to recall three of three objects after a five minute delay. He was able to repeat a five digit sequence forward inverting two digits. He was able to repeat . . . a four digit [number] backwards. He was able to recall his previous evening meal. He demonstrated the ability to concentrate during the interview. He was not persistent in his approach, and his pace appeared adequate. . . . Mr. Loveday appears to be a man of below average intelligence. His judgment and insight seem good.

R. 150-151. Dr. Nazario determined that the symptoms described by Plaintiff and "his presentation" were not consistent with any DSM-IV Axis I diagnosis. R. 151. He said: "A full psychological evaluation may be helpful to rule out mild mental retardation." *Id.* Dr. Nazario concluded that Plaintiff:

> appears to be of limited cognitive abilities, and *it is likely that he may meet the criteria for mild mental retardation. He appears able to concentrate,*

*able to understand and follow directions.* He appears able to interact with others appropriately. His reported medical difficulties need to be assessed by medical doctors in order to make a disability determination.

R. 151 (emphasis added).

On March 1, 2004, a non-examining state agency psychologist, Steven L. Wise, Psy.D., determined from review of the records that Plaintiff had a "probably *valid* [low[12]] IQ" between 60 and 70 and "certainly [decreased] functionality." R. 156 (emphasis added). He also noted that Plaintiff's IQ scores were in the sixties, "but presently better." R. 164.

Also on March 1, 2004, Plaintiff was seen at Meridian Behavioral Healthcare, Inc. R. 248. He reported he vomited every time that he eats and has trouble concentrating. *Id.* The interviewer wanted to rule out bipolar disorder, anxiety disorder, and depression. *Id.*

On March 26, 2004, William E. Benet, Ph.D., Psy.D., conducted a consultative psychological evaluation of Plaintiff. R. 181. Plaintiff was then 19 years old. *Id.* Plaintiff was responsive, attentive, and cooperative during testing, "but tended to give up easily as tasks became difficult, often saying 'I can't do this.' " *Id.* Dr. Benet also said that Plaintiff "presented as having low average ability." *Id.* Dr. Benet reviewed records, including the February 19, 2004, evaluation by Dr. Nazario, and administered the Wechsler Adult Intelligence Scale-III. *Id.* Dr. Benet found Plaintiff to be mildly depressed. *Id.* On the intelligence test, Plaintiff scored a Full Scale IQ of 64, which Dr. Benet found to be in "the extremely low range of general intellectual ability and

---

[12] A downward arrow was used in the notes, a medical symbol to indicate a decrease.

corresponds to mild mental retardation." R. 182. His Verbal Scale IQ was 69, and his

Performance Scale IQ was 63, which Dr. Benet found to be not significantly different

from the Full Scale IQ of 64. *Id*. Dr. Benet concluded:

> On the *Wechsler Adult Intelligence Scale-III*, Mr. Loveday obtained a Full
> Scale IQ score of 64, which corresponds to the first percentile for
> adolescents the same age and falls within the extremely low range of
> general intellectual ability, *corresponding to mild mental retardation*.
> There was no significant difference between his Verbal Scale IQ score of
> 69 and Performance Scale IQ of 63. *These scores were lower than
> expected, given his clinical presentation that suggested low average ability
> and reported ESE classification (SLD). He was somewhat more articulate*
> than would have been expected from his performance in testing, and *it is
> recommended that his present scores be compared with previous test
> results from school in order to assess their reliability*.

R. 182 (emphasis added).

On April 5, 2004, Lance I. Chodosh, M.D., conducted a consultative examination

of Plaintiff. R. 185. Dr. Chodosh's speciality is in family practice and occupational

medicine. *Id*. At the time, Plaintiff and his mother presented for a disability evaluation

for digestive problems and anxiety. *Id*. It was reported to Dr. Chodosh that Plaintiff had

been depressed since he was 14 years old. *Id*. He also experienced daily vomiting

spells. *Id*. He had done limited amounts of work in lawn service and helping his father

with tile work. *Id*. He was then in 10th grade taking ESE courses, and his reading skills

were at the pre-primary level. *Id*. Plaintiff reported that he had poor appetite, insomnia,

fatigue, memory loss, difficulty with concentration, irritability and moodiness, allergic

rhinitis, abdominal pain, diarrhea, and constipation. R. 186. Dr. Chodosh said that

Plaintiff did not appear to be malnourished. *Id*. He said that Plaintiff had difficulty

answering simple questions, did not know the month or the season, and he was

depressed, though cooperative. *Id.* Plaintiff had full range of motion in all joints, there was no tenderness or paraspinal muscular spasm, and the straight leg raising test for lower back pain was negative. R. 187. Motor function was grossly normal, manual dexterity and coordination were good, and strength was intact. *Id.* Dr. Chodosh determined that physically, Plaintiff had no disability.[13] R. 188. He focused primarily upon Plaintiff's mental and intellectual problems. *Id.* He said that Plaintiff probably suffered from major depression, and seemed "deeply troubled." *Id.* He thought a psychological evaluation was needed, and thus was not aware of Dr. Benet's testing a few days earlier. *Id.* Dr. Chodosh said that Plaintiff had a "limited intellect, probably in the retarded range," and thought that psychological testing was needed. *Id.* He concluded that Plaintiff was able to comprehend and follow "only simple instructions, and is probably not able to relate normally to others." *Id.*

On April 7, 2004, a non-examining state agency medical consultant reviewed the records and filled out a mental residual functional capacity form. R. 191. He said that Plaintiff was moderately limited in his ability to understand and carry out detailed instructions, and to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* and R. 192. He noted that Plaintiff has decreased "coping"[14] capacity and is illiterate. R. 193. He said that Plaintiff

---

[13] He said that Plaintiff was able to walk and stand normally, sit in a normal fashion, bend, lift, carry, squat, kneel, and crawl. R. 188. He said he was able to handle objects of size and weight appropriate for his size, age, and bone structure. *Id.*

[14] This appears to be "cop." "Coping" seems to be the most logical translation.

"doesn't come across as MR [mentally retarded] from an ADL [activities of daily living] view but tests in the 60s." *Id*. He thought that Plaintiff appeared to be "capable of simple repetitive tasks and appropriate social response." *Id*.

On April 29, 2004, Plaintiff was seen again at Meridian. R. 246-247. Plaintiff said he felt sad all of the time, and was easily angered and frustrated. R. 246. Plaintiff said that he had minimal peer relationships, and reported that he became scared and easily fatigued when he tried to work. *Id*. It was noted that his memory and concentration were impaired and it had been reported that he was mildly mentally retarded. *Id*. Plaintiff seemed to be unreliable in what he reported, but "not necessarily due to intentional deceit, but possibly due to cognitive impairments & poor insight." R. 239. Plaintiff said that he frequently experienced depersonalization, seeing himself from above. *Id*. His concentration, abstraction, and problem solving were not intact. *Id*. There was no mark to show whether Plaintiff's memory was intact or not intact, but he lacked common information and he easily misunderstood what he was told. *Id*. It was also noted that Plaintiff's sister had been diagnosed with schizophrenia and his half brother had been diagnosed with bipolar disorder. R. 246, 249. A diagnosis of generalized anxiety disorder and major depressive disorder was entered. R. 247. It was also noted that the following needed to be ruled out: post traumatic stress disorder, social phobia, bipolar disorder, and schizophrenia. *Id*. Plaintiff's mother had said that Plaintiff is mildly mentally retarded. *Id*. It was thought that Plaintiff was unable to work. *Id*. A GAF score of 45 was assigned. *Id*.

Alejandro F. Vergara, M.D., prepared a psychiatric review technique form on July 26, 2004.  R. 271.  His review concerned Rule 12.05, mental retardation.  *Id.*  He thought that Plaintiff had a *valid* IQ score between 60 and 70.  R. 275.  He thought that Plaintiff would have moderate difficulties in maintaining concentration, persistence, or pace.  R. 381.  Dr. Vergara noted from the examination by Dr. Nazario on February 19, 2004, that Plaintiff was alert, cooperative, his mood was stable, and his recent and remote memory were intact.  R. 283.  He noted that Plaintiff had performed a series of mental status tests without errors, was able to concentrate during the interview, took care of his personal needs and hygiene, could cook simple meals and clean the house, and talks with friends, but does not socialize much.  *Id.*  Dr. Vergara also prepared a mental residual functional capacity assessment, finding Plaintiff to be moderately limited in his ability to understand, remember, and carry out detailed instructions, to complete a normal workweek without interruptions, to set realistic goals and make plans independently of others, but markedly limited in his ability to accept instructions, respond appropriately to criticism, and to travel in unfamiliar places.  R. 285-286.  Dr. Vergara commented that Plaintiff "may experience difficulties trying to understand and r[e]member detailed instructions, also to carry out th[ese] instructions as well as trying to set realistic goals independently."  R. 287.  He thought, however, that Plaintiff's activities of daily living are not significantly impaired or limited, and said that Plaintiff "appears capable of doing simple repetitive types of instructions and tasks."  *Id.*

**Legal analysis**

### Whether at step 3 the ALJ should have found that Plaintiff meets Listing 12.05C for mental retardation

Plaintiff contends that the ALJ should have found that he meets Listing 12.05C. He notes that the IQ testing resulted in scores below 70, and in addition, he has several significant physical and mental impairments, including degenerative disc disease of the cervical spine, left should rotator cuff sprain, idiopathic gastroparesis, and adjustment disorder. Doc. 17, p. 13.

On January 23, 2008, after the first administrative hearing and adverse decision, the Appeals Council remanded, among other things, to "determine *whether* the claimant's IQ test results are *valid*." R. 377 (emphasis added). The IQ results at issue are those from 2004. As noted above, Listing 12.05C specifically asks for a determination of whether the IQ scores are valid. "Validity" means "the test measures what it is supposed to measure." Listing 12.00D.5.c(1).

The Commissioner's rules provide that if the claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, Subpart P, following 20 C.F.R. § 1599, then a finding of disability will be made at Step 3 without considering the claimant's age, education, and work experience. 20 C.F.R. § 1520(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' " <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990) (emphasis by the Court). A claimant

is entitled to benefits if it is shown that his or her limitations meet, or are medically or functionally equal to, the limitations set forth in the Listing.  <u>Shinn ex rel. Shin v. Commissioner</u>, 319 F.3d 1276, 1282 (11th Cir. 2004).  The claimant has the burden of proving that his impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria.  <u>Sullivan v. Zebley</u>, 493 U.S. at 530, 110 S.Ct. at 891.  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.* (emphasis by the Court).

> Listing 12.05C provides in relevant part:
>
> 12.05 *Mental retardation*:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*               \*               \*
>
> C.  A *valid* verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Listing 12.05C, Appendix 1 to Subpart P of Part 404 – Listing of Impairments, 20 C.F.R. (emphasis added).  Listing 12.00 provides: "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."

In <u>Lowery v. Sullivan</u>, 979 F.2d 835 (11th Cir. 1992), the court held:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a *valid* I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities.

979 F.2d at 837 (emphasis added). The court said, however, that "a *valid* I.Q. score need *not be conclusive of mental retardation* where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior." *Id.*, *citing* <u>Popp v. Heckler</u> 779 F.2d 1497, 1499 (11th Cir. 1986) (emphasis added). In <u>Popp</u>, our circuit held that it is also appropriate to consider medical reports, daily activities, behavior, and other evidence in the record. 779 F.2d at 1499.

On remand in this case, the ALJ took no new evidence as to the validity of the IQ scores from the testing in 2004. At step 2, the ALJ determined that Plaintiff has the following "severe" impairments: "degenerative disc disease of the cervical region of the spine, left shoulder rotator cuff sprain, idiopathic gastroparesis, *borderline intellectual functioning*, and adjustment disorder." R. 355 (emphasis added). Thus, she did not find Plaintiff to be mildly mentally retarded based upon his IQ test scores below 70.[15]

At step 3, when the issue was whether the Plaintiff had shown that his condition met or equaled Listing 12.05C, the ALJ reasoned:

> While the claimant did have IQ scores in the 60's, Dr. Benet stated that the scores were lower than expected, given his clinical presentation, thus

_____

[15] "Borderline intellectual functioning" generally refers to someone with an IQ from 71-84. <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1338 n. 9 (11th Cir. 1999), *cert. denied*, 531 U.S. 861 (2000) (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 45 (4th ed. 1994)).

> questioning the validity of the findings. Therefore, the undersigned gives
> *little weight* to the findings of the WAIS-III performed in March 2004.

R. 359 (emphasis added). This side-stepped the issue of the validity of the test scores.

It is unclear whether this passage is an implicit finding that the scores were invalid

based upon Dr. Benet's comment. I will assume that it was, since that was one of the

issues to be clearly decided on remand, but the court could just as reasonably

determine that the ALJ found the scores to be valid but not worthy of evidentiary weight.

Dr. Benet's comment, standing alone, however, is not substantial evidence from

which to determine that the IQ scores were invalid as opposed to not of probative value.

Dr. Benet simply said that further inquiry might be appropriate given Plaintiff's

presentation during testing. He did not find that Plaintiff was malingering or trying to

achieve a "false bad" result. Indeed, he found Plaintiff to be responsive and

cooperative.[16] State Agency psychologist Wise apparently found the scores to be

probably valid. R. 156. State Agency physician Vergara found that Plaintiff had a valid

IQ under 70. R. 275. If the Commissioner had doubts, a second IQ test could have

been administered on remand. *See*, Brown v. Secretary of Health and Human

Services, 948 F.2d 268, 271 (6th Cir. 1991).

Still, Dr. Benet's comments are some evidence that the IQ scores, even if valid,

might not be dispositive, that is, that "little weight" should be given to the scores. The

---

[16] In Lax v. Astrue, 489 F.3d 1080, 1089 (10th Cir. 2007), the claimant did not put forth sufficient effort on the first IQ test, and his presentation to the expert on the second test was found to be inconsistent with the test results, and thus the ALJ properly discounted the IQ scores. Likewise, in Clay v. Barnhart, 417 F.3d 922, 930-931 (8th Cir. 2005), the ALJ properly rejected IQ scores because the tester found one test to have produced invalid results and the results from the other test were deemed to be inconsistent with the claimant's "demonstrated abilities."

ALJ was permitted to consider those comments for that purpose. Lowery, *supra*, 979 F.2d at 837. There was little to consider, at that point, since the ALJ did not order another battery of IQ testing. Again, standing alone, the questions raised by Dr. Benet were never answered and we are left with IQ scores that have not been shown to be invalid, i.e., that they failed to test what was to be measured.

The ALJ then proceeded to step 4 of her analysis and returned to the issue of mental retardation. In the course of her determination of Plaintiff's mental residual functional capacity, she again addressed the problem of the IQ scores. She noted that Dr. Kronberger felt that the IQ scores were "of questionable validity." R. 360. She said that Plaintiff had a driver's license "and his other activities did not support the mild mental retardation diagnosis." *Id.* The ALJ noted that Dr. Kronberger felt that Dr. Nazario's assessment "was inconsistent with the fact that the claimant had intact memory and was able to concentrate adequately during the interview and there was no diagnosis on Axis I." *Id.* She noted that Dr. Kronberger thought that the GAF score of 45 was invalid, based on misinformation from Plaintiff's self-reports. *Id.* She noted that after reviewing the evidence, Dr. Kronberger thought that Plaintiff could do simple, repetitive tasks, and that these limitations were consistent with Plaintiff's past work as a construction worker, lawn care worker, and a cook. *Id.*

Further along in the step 4 analysis, the ALJ again noted that Dr. Benet "questioned the validity" of the IQ scores. R. 361. She again noted that Dr. Nazario had found that Plaintiff had adequate attention and concentration, and was able to understand and follow instructions. *Id.* She observed that Plaintiff was "able to take

care of his personal need[s], perform household chores, and was able to socialize with his friends." *Id.*, citing Exhibit 4F (Dr. Benet's report). She said that Dr. Chodosh "noted in April 2004 that the claimant was able to comprehend and follow simple instructions." *Id.* She said that the records from Meridian "showed that the claimant's cognitive functioning appeared intact and he was cooperative, friendly, and communicated well." *Id.* (citing Exhibit 12F generally). She concluded that Plaintiff's "mental impairments cause some functional limitations, however, these limitations are not disabling." *Id.*

All of the step 4 analysis has its place in step 4, but first there is step 3. The remand was to give Defendant an opportunity to do a better job at step 3. Giving Defendant the benefit of the doubt, the reasoning set forth in step 4 will be considered as reasoning to determine whether the IQ scores were "valid," or even if "valid," do not adequately describe Plaintiff's capabilities. In other words, the reasoning that the ALJ articulated in step 4 will be reviewed as if it had occurred in step 3.

The evidence of daily activities and the driver's license will be addressed first. Plaintiff was driven to the IQ testing in 2004 by his mother. R. 148. Plaintiff drove himself to the hearing on December 3, 2008. R. 464, 473. Plaintiff also testified that he failed the driver's test twice, and had the test read to him. R. 485-486. This is scant evidence to determine that the IQ test scores were invalid or fail to describe Plaintiff's capabilities with accuracy.

For the daily activities finding, the ALJ cited Exhibit 4F, Dr. Benet's report of what he learned about Plaintiff's daily activities. Dr. Benet said:

> Mr. Loveday reports that he is not able to go grocery shopping. He reports that he has never gone grocery shopping. He reports that he is

> able to take care of his personal hygiene needs.  He reports that he is able
> to cook, "a little bit". . . .  He reports he is able to clean house, and do
> laundry.  He reports that he is not to wash dishes or work on the yard [sic].
> He reports that he is too weak, and gets dizzy. . . .
>
>     *     *     *
>
> Mr. Loveday reports his daily activities as trying to do things, like working
> out, or going outside to do things.  He reports that he lays [sic] down a lot.
> He reports that he sits, there, thinking about what's going to happen with
> [t]he rest of his life.  He reports that he tries to fix things and they don't
> work.  He reports that his social life consist[s] of seeing friends once a
> week.  He reports that he talks with friends . . . .

R. 149.  In sum, this is evidence that Plaintiff takes care of his personal hygiene, but no

other personal needs, that he can clean the house and do laundry, but cannot perform

any other household chore, and that he sometimes sees friends.  It is not substantial

evidence to determine that the IQ scores were invalid or did not adequately describe his

condition.

The only record from Meridian that addressed the subject of Plaintiff's cognitive

functioning in detail was from April 29, 2004.  It did not find Plaintiff's cognitive

functioning to be intact.  The reviewer first noted that Plaintiff's memory and

concentration were impaired.  R. 246.  It was noted that Plaintiff said that he had

minimal peer relationships.  *Id.*  In the check list, it was observed that Plaintiff's

concentration, abstraction, and problem solving were not intact.  R. 239.  There was no

mark to show whether Plaintiff's memory was intact or not intact, but it was observed

that Plaintiff lacked common information and he easily misunderstood what he was told.

*Id.*  Thus, this record is not substantial evidence from which to conclude that Plaintiff's

cognitive functioning appeared to be intact.  Further, it is unreasonable that the ALJ

would find the record from Meridian to be reliable for one part of the findings, which

misquoted the record, and disregard the assignment of a GAF score of 45 in the same

record.  As noted earlier in footnote 9, a GAF score of 45 indicates significant

impairment of functioning.

The ALJ reasoned that the IQ scores were either invalid or not adequately

descriptive of Plaintiff's abilities because Dr. Nazario had found that Plaintiff had

adequate attention and concentration, and was able to understand and follow

instructions.  This is not all that Dr. Nazario said.  Dr. Nazario concluded that Plaintiff:

> appears to be of *limited cognitive abilities, and it is likely that he may meet
> the criteria for mild mental retardation.*  He appears able to concentrate,
> able to understand and follow directions.

R. 151 (emphasis added).  Dr. Nazario also said: "A full psychological evaluation may

be helpful to rule out mild mental retardation."  *Id.*  In other words, even though Plaintiff

appeared able to concentrate, understand, and follow directions, Dr. Nazario still

believed that he met the criteria for mild mental retardation and he deferred to a full

psychological evaluation.  That evaluation was conducted by Dr. Benet a month later.

In sum, the findings of Dr. Nazario mentioned by the ALJ are not substantial evidence to

determine that the IQ scores are invalid or not adequately descriptive of Plaintiff's

capabilities.

The ALJ next reasoned that the IQ scores were invalid because Dr. Chodosh

"noted in April 2004 that the claimant was able to comprehend and follow simple

instructions."  R. 361.  This observation is of much the same evidentiary value as the

finding by Dr. Nazario that Plaintiff appeared able to concentrate, understand and follow

instructions.  Dr. Chodosh also found that Plaintiff had difficulty answering simple

questions, did not know the month or the season, and was depressed, though cooperative. R. 186. Dr. Chodosh further found that Plaintiff probably suffered from major depression, and seemed "deeply troubled." R. 188. He, like Dr. Nazario, thought that Plaintiff had a "limited intellect, probably in the retarded range," and thought that psychological testing was needed. *Id.* He concluded that Plaintiff was able to comprehend and follow "only simple instructions, and is probably not able to relate normally to others." *Id.* That Plaintiff is able to concentrate in a basic way, and understand and follow simple instructions, is not substantial evidence to invalidate the IQ test scores or to find that the IQ scores did not adequately describe Plaintiff's capabilities.

This leaves for consideration the evidence provided by Dr. Kronberger. Dr. Kronberger added nothing new. He repeated the evidence discussed above as a basis for his opinion that the IQ scores were invalid. He noted that Dr. Benet had questions about the scores, that Plaintiff had a driver's license, that his activities did not support a mild mental retardation diagnosis. R. 360, discussing the evidence from Dr. Kronberger. Dr. Kronberger, likewise, relied upon Dr. Nazario's findings, discounted the GAF score of 45. *Id.* If this was not substantial evidence for the ALJ to determine the IQ scores were invalid, it was likewise not substantial evidence to support Dr. Kronberger's opinion. After all, he did not examine or test Plaintiff. Dr. Kronberger simply review the records.

The last portion of the discussion of Dr. Kronberger's testimony is perhaps the central issue. The ALJ noted that after reviewing the evidence, Dr. Kronberger thought

that Plaintiff could do simple, repetitive tasks, and that these limitations were consistent with Plaintiff's past work as a construction worker, lawn care worker, and a cook.  R. 360.  The ALJ found the IQ scores to be invalid, or at least not adequately descriptive of Plaintiff's impairment, because Plaintiff had worked in lawn work, as a cook, and laying tile.

It does seem superficially unreasonable for there to be a finding that a claimant meets or equals a Listed impairment, and is awarded benefits at step 3, and yet has shown an ability to work at some job and earn money.  But that is not how analysis at step 3 proceeds.  If a claimant proves a disability that meets or equals a Listed impairment, the analysis stops and benefits are awarded.  There is no analysis at step 4 as to whether the claimant might be able to do past relevant work.[17]  That a claimant has previously been gainfully employed is evidence which may be considered at step 3 to determine whether the IQ scores adequately describe functional limitations, but the fact of prior gainful employment does not, *ipso facto*, move the analysis to step 4.

For example, as noted in Lowery, in Popp the court sustained the ALJ's rejection of a claim of equivalency to Listing 12.05C because the claimant's IQ score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher."  979 F.2d at 837, citing Popp, 779 F.2d at 1488.  Additionally, there was evidence in Popp that the claimant had "tended to place himself in a very unfavorable

_____

[17] In any event, the ALJ in this case determined that Plaintiff's prior work, while gainful activity, did not constitute past relevant work.  R. 362.

light," thereby rendering the personality test scores (the MMPI, not the IQ test) invalid in the opinion of the examiner.  Popp, 779 F.2d at 1498-1499, 1500.

Popp is perhaps the strongest case for finding that an IQ score below 70 does not necessarily meet Listing 12.05C.  There are several others with facts somewhat like Popp.

For example, Bischoff v. Astrue, 2008 WL 4541118 (S.D. Fla. Oct 9, 2008) (No. 07-60969-CIV), affirmed the determination that Listing 12.05C was not met.  The court noted that while the claimant's IQ scores were lower than 70, the claimant had previously worked as a parts manager and an automobile mechanic, jobs which required technical knowledge and skills, and he successfully supervised other people for five years.  Id., at *20.  There was also evidence that the claimant was "faking" his IQ score, and gave conflicting reports that he had finished only the sixth, or seventh, or eighth, or ninth, or tenth grades, or had a G.E.D., or had vocational training.  Id.

In Outlaw v. Barnhart, 197 Fed.Appx. 825, 827 (11th Cir. Aug 10, 2006) (not selected for publication in the Federal Reporter, NO. 05-15996), the court affirmed the finding that Listing 12.05C had not been satisfied, noting that the claimant had an IQ above 70 (which, standing alone, distinguishes it from the case at bar), and "had worked for several years as an adult as a van driver, a security guard, and in the shipping and receiving department at a pecan plant," and these activities were inconsistent with his IQ scores.

The same result occurred in Davis v. Astrue, 2008 WL 2939523 (M.D. Ala. Jul 25, 2008) (No. CIV.A. 2:07CV880-TFM).  In that case, although the claimant had an IQ

score under 70, she had completed twelfth grade, received training in cosmetology and secretarial skills, had a driver's license, was able to read, write, and perform simple math, and a consulting psychologist had determined that she was in the borderline level of intellectual functioning rather than mildly retarded. *Id.*, at *3.

To like effect is Brown v. Astrue, 2009 WL 2135005 (S.D. Ga. Jul 15, 2009) (No. CV608-036). In that case, the court affirmed the ALJ's denial of the claim. Although the claimant had performance and full scale IQ scores below 70, he admitted in his work questionnaires "that while working as a carpenter he was a lead worker who supervised, hired, and fired employees, and regularly used machines and technical knowledge and skills, including taking measurements and making calculations. . . . And as a farmer he also supervised other workers." 2009 WL 2135005, *5, n. 5. *See also*, Lyons v. Astrue, 2009 WL 1657388, *10-11 (M.D. Fla. Jun 10, 2009) (No. 208-CV-614-FTM-29SPC) (the claimant obtained a high school diploma, did not take special education classes, could take care of his personal needs, earned from $13,000 to $18,000 per year for 7 years, and there was evidence that he was malingering when he took the intelligence tests).

A case with different result is Durham v. Apfel, 34 F.Supp.2d 1373 (N.D. Ga. 1998).[18] There, the court held:

> Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101-102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual.

---

[18] This is a report and recommendation to a district judge by a magistrate judge. The report and recommendation was adopted by the court. Case No. 1:97cv2061IRWS, doc. 12 entered on December 22, 1998, available on PACER. No appeal was taken.

34 F.Supp.2d at 1380. Distinguishing <u>Popp</u>, the court said:

> Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade.

*Id. See also,* <u>Markle v. Barnhart</u>, 324 F.3d 182, 187 (3d Cir. 2003) ("ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs," and "ability to identify and administer his medication; his previous jobs; his obtaining a GED" were not inconsistent with a finding of mental retardation and the IQ scores) (citing <u>Brown v. Sec'y of HHS</u>, 948 F.2d 268, 270 (6th Cir. 1991), "rejecting the Commissioner's argument that a claimant's full scale IQ of 68 was inconsistent with, among other things, his driver's license and work history as a truck driver, limited literacy and sixth grade education, and ability to make change, do laundry, and clean his room.").

The case at bar is much more like the evidence in <u>Durham</u>, <u>Markle</u>, and the last <u>Brown</u> case. The apparent conclusion that the IQ test scores were invalid or not adequately descriptive of Plaintiff's intellectual capabilities is not supported by substantial evidence. Plaintiff's scores were consistently below 70, and Dr. Benet found them to be consistent with mild mental retardation. Plaintiff's work as a laborer, setting tiles and doing lawn work, is much like the work in <u>Durham</u>, <u>Markle</u>, and the last <u>Brown</u> case. Indeed, the evidence suggests that some of Plaintiff's work was somewhat sheltered as it was with his father, and other work ended when not performed satisfactorily. Dr. Kronberger himself noted that there was not a lot of information about Plaintiff's mental ability, and "we don't know why he left those jobs that he had. We

don't [know] what specific problems he had."  R. 502.  Plaintiff did not complete school

and he was in ESE classes.  He has not had the responsible work history of the

claimants in the other cases discussed above.  There was not substantial evidence in

this record to fail to give substantial weight to the IQ scores or to find those scores to be

invalid.

### Physical or other mental impairments imposing additional and significant work limitations

Listing 12.05C also requires evidence of "a physical or other mental impairment

imposing an additional and significant work-related limitation of function."  Under an

earlier version of this Listing, our circuit interpreted this as something that is "significant"

but less than a "severe impairment" as defined at Step 2.  Edwards by Edwards v.

Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985) (emphasis added).  But as pointed out in

Carroll v. Astrue, 2009 WL 1708073, *1 (M.D. Ala. Jun 17, 2009) (No. CIV. A.

108CV74-SRW), this was modified in 2000 and the introductory paragraph of Listing

12.00 now equates this criterion with a "severe" impairment as intended at step 2 and

governed by 20 C.F.R. §§404.1520(c) and 416.920(c).

At step 2, the ALJ found that Plaintiff has four severe impairments unrelated to

his intellectual functioning:  adjustment disorder, degenerative disc disease of the

cervical region of the spine, left shoulder rotator cuff spring, and idiopathic

gastroparesis.  R. 355.  A "severe" impairment at step 2 is a condition which has more

than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or

handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20

C.F.R. § 404.1521).  The "work-related limitation of function" intended by Listing 12.05C

is the same form of impairment. Consequently, it cannot now be disputed that Plaintiff has "a physical or other mental impairment imposing an additional and significant work-related limitation of function," that is, degenerative disc disease of the cervical region of the spine, left shoulder rotator cuff spring, and idiopathic gastroparesis. Etheridge v. Astrue, 2009 WL 3233899 (S.D. Ala. Sep 29, 2009) (No. CIV. A. 08-00357WSB) (finding of "severe" physical impairments at step 2 *ipso facto* was a finding that the claimant had shown an impairment as required by the second prong of Listing 12.05C); Carroll v. Astrue, 2009 WL 1708073, *2 (same).

**Conclusion**

In summary, the ALJ's step 3 determination that Plaintiff did not prove that his intellectual functioning impairment met Listing 12.05C is not supported by substantial evidence in the record. If this recommendation is adopted, the court need not consider other issues raised by Plaintiff.

Whether to remand for further consideration is the next issue. The court should not remand. "Reversal is warranted where the record is fully developed and, upon the application of correct legal standards, the claimant is entitled to benefits." Durham, 34 F.Supp.2d at 1381, citing Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991). The record is fully developed. That is the proper remedy here.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on October 22, 2010.

s/   William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.